250 So.2d 211 (1971)
JEFFERSON TRUCK EQUIPMENT CO., Inc.
v.
GUARISCO MOTOR CO., Inc.
No. 8348.
Court of Appeal of Louisiana, First Circuit.
May 31, 1971.
*212 Thomas Loop, of LeBrun, Karne, Lockhart, Metairie, for appellant.
Anthony J. Guarisco, Jr., of Levy, Burleigh, Russo & Bourg, Morgan City, for appellee.
Before LANDRY, ELLIS and BLANCHE, JJ.
LANDRY, Judge.
Plaintiff-appellant, Jefferson Truck Equipment Co., Inc. (Jefferson) appeals the judgment of the trial court refusing to enforce the verbal sale by plaintiff to defendant, Guarisco Motor Company, Inc., of a truck mounted lifting device known in the trade as a Pitman H L 70 crane. After accepting delivery of the device, defendant stopped payment on the check given in consideration of the sale on the ground the crane did not possess the qualities agreed upon. The sole question in this litigation is whether there was error as to the qualities of the crane relating to the principal cause of the contract thereby providing grounds for rescission of the agreement. The trial court answered the question in the affirmative. We affirm.
The record discloses that in 1967 Athena Corporation, a contracting firm in Morgan City, Louisiana, obtained a rather large contract to lay pipe in Morgan City, Louisiana. The job required the use of a truck mounted crane capable of lifting lengths of pipe weighing 2250 pounds and moving the pipe a distance of 20 feet. Athena's president, Carl Edward Teague, communicated his needs to his brother-in-law, Leonard Guarisco, Manager of Guarisco Motor Company, Inc. Mr. Guarisco undertook to supply Athena with the complete assembly of truck and crane. Mr. Guarisco then ordered the required truck chassis and obtained information from a Baton Rouge, Louisiana dealer regarding the capabilities of an Alenco crane. Before the crane was ordered, Hugh Tracey, III, Jefferson's President, called upon Teague and learned that Teague was in need of a crane. Teague referred Tracey to Mr. Guarisco. All negotiations for the sale of the crane were conducted between Tracey and Leonard Guarisco.
Tracey's testimony is that no details of the sale were discussed with Teague. Upon contacting Mr. Guarisco, at Teague's suggestion, Tracey learned that Guarisco had received a quotation from Dealer Truck, of Baton Rouge, on a crane known as an Alenco 5-T-2. Tracey informed Guarisco that Jefferson sold both Alenco and Pitman cranes. Tracey reviewed the features of his products with Mr. Guarisco and showed Mr. Guarisco literature describing some of the various types of cranes which Tracey could furnish. Tracey stated that Mr. Guarisco specified a crane with a telescoping boom and commented that either an Alenco 5-T or a Pitman 70-B crane would suit his purposes, but that Guarisco said nothing about lifting capacity. Tracey contends he gave Guarisco capacity specifications on the Pitman 70-B crane and then called his sales manager, Winston Scott, requesting that quotations and literature on the Alenco and Pitman cranes be sent Mr. Guarisco. Approximately two weeks later, Mr. Guarisco placed an order for a Pitman 70 B crane. Tracey attributed Mr. Guarisco's order of the Pitman rather than the Alenco crane to the fact that Mr. Guarisco had some misgivings as to the durability of *213 the rotary gear assembly of the Alenco crane. Mr. Tracey also stated he had no reason to promote sale of the Pitman 70 B over the Pitman 100-C model, which latter device was larger, more expensive, and would have brought Jefferson a larger profit. Tracey noted that Mr. Guarisco, after rejecting the Pitman 70 B, requested a Pitman 100-C, a larger unit. Tracey also stated that Mr. Guarisco accepted delivery of the crane at Jefferson's place of business after a one hour demonstration in which the operation of the crane was displayed. Tracey observed that Mr. Guarisco receipted for the machine, gave a check in the sum of $7,053.35 in payment therefor, and drove away in the truck on which the crane was mounted. Subsequently, Tracey was advised as to the error. Tracey's employee, Scott, discussed the matter with Mr. Guarisco by telephone and assured the latter that the machine would perform as desired. Later, Scott went to Morgan City and offered to guarantee in writing that the machine could perform as required, and also offered to obtain such a written assurance from the manufacturer. His offer was declined. Tracey was of the view that Mr. Guarisco desired the larger machine at the same price. Tracey also believed that the sale was repudiated because the buyer received a lower bid from another source. He conceded that an Alenco 5-T-2 has a larger manufacturer's rated capacity than a Pitman 70-B.
Plaintiff's former sales manager, Winston Scott, testified that he received a call from Tracey requesting that quotations and literature be sent Mr. Guarisco on Pitman and Alenco cranes. Approximately two weeks after the bids and literature were sent, Mr. Guarisco telephoned an order for a Pitman 70-B crane. Defendant supplied a truck chassis on which the crane was mounted. When the installation was complete, Mr. Guarisco accepted the machine after a demonstration and paid for it by check. After Mr. Guarisco stopped payment on the check, he notified Scott that the crane did not do what it was supposed to do. Scott also stated that the rated capacity of the machine was plainly visible on plates appearing on both sides thereof.
Carl Edward Teague testified that he needed the type of machine indicated for the purpose above stated. He requested Mr. Guarisco to obtain both the truck and crane and left the matter entirely in Mr. Guarisco's hands. He stated that he dealt solely with Mr. Guarisco, not with plaintiff. When he inspected the crane after its delivery to Guarisco, he immediately noted that its rated capacity, as shown on the attached plates, did not meet his requirements of lifting 2250 pounds on a 20 foot extension and that he could not use the device. Later, he met with a representative of plaintiff and was assured the Pitman 70-B could lift twice its rated capacity and was adequate for Teague's purposes. Teague replied that he noted the rated capacity of the Pitman 70-B was a maximum of 1750 pounds at 20 feet. He also noted that a Pitman 100-C crane has the required lifting capacity and that Guarisco eventually provided him with an Alenco 5-T-2 crane which met his requirements.
Mr. Leonard Guarisco testified he was requested by Teague to provide a truck with a mounted crane capable of lifting 2200 to 2550 pounds with a 20 foot extension. He contacted Dealer Truck for a bid on an Alenco crane and showed the bid to Tracey when Tracey came to his office upon referral by Teague. Mr. Guarisco stated he informed Tracey that he needed a crane that could lift 2250 pounds at a 20 foot extension. He also stated that before Tracey called upon him, he had resolved to buy an Alenco 5-T-2 crane because it had the desired rated qualities. Guarisco noted that Tracey stated he could supply either an Alenco or Pitman crane, but did not specify the numerical designation of a Pitman crane that would be the equivalent of an Alenco 5-T-2. Mr. Guarisco also stated that he informed Tracey the intended use of the crane desired. He stated that he knew nothing about hydraulic equipment, and for that reason, he did not *214 examine the face plates on the crane when he accepted delivery. He was unaware that the crane sold did not meet the required specifications until so advised by Teague. He acknowledged receiving quotations from plaintiff on a Pitman 70-B and an Alenco 5-T crane, but denied receiving literature from plaintiff on these particular model cranes. He explained that he never examined the literature sent by Tracey because of Tracey's verbal assurance that he would receive a crane equivalent to the Alenco 5-T-2, which met the requirements of the ultimate purchaser. He also explained that he did not order the 5-T-2 model because he was of the impression it had a faulty gear box and also because the Pitman crane could operate at 20 below horizontal, a feature the Alenco machine did not possess. He asserted that he ordered the Pitman 70-B because of Tracey's assurance it was the equivalent of the Alenco 5-T-2. After learning from Teague that the machine was not suitable, Guarisco so advised plaintiff. Thereafter, Scott came to Morgan City and offered a written guarantee that the machine furnished could satisfy Teague's requirements, but the guarantee was never submitted. He also stated that Tracey offered to sell him the crane at a reduced price, which offer was declined. He declared that the crane was then removed from the truck chassis and stored in defendant's place of business and has never been used.
The trial court found that defendant agreed to purchase the Pitman crane relying upon Tracey's assurance that it would perform comparable to the Alenco 5-T-2 model. The trial court also found that defendant bargained for a crane with a manufacturer's rating and guarantee that would meet the purchaser's requirements whereas plaintiff-seller negotiated on the basis of selling a crane with a mechanical performance capability required by the buyer. On this basis, the lower court held the sale invalid because it lacked requisite consent in that there was no meeting of the minds of the parties. Additionally, the trial court deemed the transaction voidable because the vendor knew the needs of the purchaser and failed to furnish an object that met those requirements.
Appellant's chief complaint is that the trial court erred in voiding the contract in the absence of a showing of mutual error. Appellant maintains on authority of Hello World Broadcasting Corp. v. International Broadcasting Corp., 186 La. 589, 173 So. 115, and Kirkland v. Edenborn, 140 La. 669, 73 So. 719, that a contract may not be avoided for error unless there is mutual error. In this regard, appellant contends that in this instance, only the buyer, if anyone, acted under an error of fact. In so contending, counsel for appellant is mistaken. As will hereinafter appear, a contract may be reformed only for mutual error. On the other hand, a contract may be annulled, avoided or invalidated for unilateral error as to the substance or some substantial quality of the subject matter of the agreement.
LSA-C.C. arts. 1819 and 1820 declare that requisite consent to a contract is lacking when there exists an error of fact. To vitiate a contract, an error of fact must pertain to the principal cause for making the agreement and must pertain to either the motive for making the contract, the person with whom the contract is made, or to the subject matter of the contract itself. LSA-C.C. art. 1823. Error as to the thing invalidates a contract only if it bears upon the substance or some substantial quality of the thing that constitutes the object of the agreement. LSA-C.C. art. 1842. Error as to the substantial quality of an object refers to that quality which give the object its greatest value. LSA-C.C. art. 1844. Error as to other qualities of an object will also serve to vitiate a contract if such qualities constitute the principal cause of making the contract. LSA-C.C. art. 1845. The cause of a contract is the consideration or motive for making it. LSA-C.C. art. 1896.
The established motive for making the contract in question was to secure a crane with the capacity of lifting an object weighing *215 at least 2250 pounds and moving it a distance of twenty feet. In accepting plaintiff's bid for the crane in question, we find that Mr. Guarisco did so in error under the mistaken belief that its rated capacity met the requirements communicated to Tracey. From the record, we are convinced that Mr. Guarisco would never have entered into an agreement to purchase the crane in question had he known its rated capacity did not meet Teague's needs.
Hello World Broadcasting Corp., above, relied upon by appellant, is not authority for the principle that mutual error is required to invalidate a contract. The cited authority was an attempt to reform a contract for the sale of a radio station so as to prevent the vendee thereof from operating the station on a different wave length following the sale. Plaintiff therein contended he considered retention of the former wave length a principal part of the consideration for the transfer, although no mention of such retention appeared in the agreement. With respect to this contention, the court observed:
"It is elementary that plaintiff's right to reframe a contract for error or mistake must result from an error or mistake that is mutual. This rule of law is made clear in C.J. page 373, which reads as follows:
`A mistake of one of the parties only in the expression of his agreement or as to the subject matter, not known to the other, does not affect its binding force, and is no ground for its rescission even in equity.'
See, also, Kirkland v. Edenborn, 140 La. 669, 73 So. 719.
"Article 1826 of the Civil Code declares: `No error in the motive can invalidate a contract, unless the other party was apprised that it was the principal cause of the agreement, or unless from the nature of the transaction it must be presumed that he knew it.'
"The intent of the parties, in our opinion, is expressed in clear and unambiguous language. In such a case, a court will not resort to construction but will enforce the contract according to its terms. 16 C.J. 520."
We understand Hello World, above, to establish two basic principles regarding the law of contracts. First, it holds that a contract may be reformed for error only if the error is mutual. Secondly, that a contract may be invalidated for error on the part of one only provided the other party is apprised of the basis of the error. In Hello World, above, the court found that the vendee was unaware of the seller's intent to require operation on the same wave length following the sale as a principal part of the consideration for the transfer.
The instant matter is readily distinguishable from Hello World, above. In this instance, the trial court found, and we concur in that determination, that vendor herein was fully aware that defendant intended to purchase a device with a specified rated and guaranteed lifting and moving capacity. We likewise find that plaintiff took it upon itself to furnish defendant a crane that could possibly or probably do the work, but was not rated or guaranteed to do so.
Kirkland v. Edenborn, 140 La. 669, 73 So. 719, is inapposite. Said authority merely holds that, in that instance, there was an absence of an error of law with regard to the confection of a contract for the sale of timber.
We find the case at hand falls within the ambit of LSA-C.C. art. 1845, which provides that a contract may be rescinded for error of fact as to the quality of an object which quality pertains to the principal cause of making the contract. Error as to the nature or object of a contract may be with regard to either the substance of the object of the agreement, or a substantial quality of the object, or of some other quality of the object if such quality is the principal cause of making the contract.
*216 LSA-C.C. art. 1843 provides that error as to the substance of the object of a contract is sufficient grounds for rescission of an agreement where one or both parties have made such an error. In this regard, art. 1843, above, declares:
"There is error as to the substance, when the object is of a totally different nature from that which is intended. Thus, if the object of the stipulation be supposed by one or both the parties to be an ingot of silver, and it really is a mass of some other metal that resembles silver, there is an error bearing on the substance of the object."
We see no valid basis for distinguishing between an error as to substance, error as to a substantial quality, and error as to a quality which is the principal cause of a contract. We conclude, therefore, that unilateral error in any one of these respects constitutes ground for rescission of an agreement. We also find that LSA-C.C. art. 1845, which provides that a contract may be rescinded for error as to quality which constitutes the principal cause of a contract, must be interpreted together with LSA-C.C. art. 1826, which states that error as to a principal cause of a contract does not vitiate a contract unless the other party to the agreement is apprised of the motive of the agreement or is presumed to know such motive.
Pursuant to the foregoing codal provisions, our brothers of the Third Circuit held in Humble Oil & Refining Company v. P. J. Chappuis, II et al., 239 So.2d 400, that unilateral error as to the quality of an object which constitutes the principal cause of the agreement is sufficient ground for rescission where the other party is apprised of the motive or is presumed to have knowledge thereof. In so declaring, the court stated:
"Mutual error of fact is not necessary to abrogate a contract. Unilateral error is sufficient. Peoples Homestead & Savings Association v. Worley, 191 La. 453, 185 So. 880 (1939); Louisiana Sulphur Mining Company v. Brimstone Railroad & Canal Company, 143 La. 743, 79 So. 324 (1918); Berard's Heirs v. Berard, 2 La. 1 (1830); and Pan American Petroleum Corporation v. Kessler, 223 F.Supp. 883 (D.C.1963) a federal case from Louisiana which, like the present matter, deals with the release of a mineral lease through error of fact.
* * * * * *
We find no evidence of any mandate from the Chappuis family to Mr. Cliff Morrow to request the release. Hence, no error is attributable to them. It is fundamental in our law that mutual error is required to reform a contract to make it conform with the true intention of the parties." Louisiana Sulphur Mining Company v. Brimstone Railroad & Canal Company, supra; Carter Oil Company v. King, La.App., 134 So.2d 89 (2d Cir. 1961).
We find that the instant case falls squarely within the rule of Humble Oil, above. Since defendant herein acted under an error of fact as to a quality of the object of the sale which was the principal cause of the agreement, and plaintiff herein is found to have knowledge of such error, the contract is subject to rescission for lack of requisite consent.
The judgment of the trial court is affirmed; all costs of these proceedings to be paid by appellant, Jefferson Truck Equipment Co., Inc.
Affirmed.